Filed 12/2/14  P. v. Salinas CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B255540 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA103012) |
| v. | |
| RODOLFO SALINAS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Juan C. Dominguez, Judge.  Affirmed.

Sheila Quinlan, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

Defendant and appellant, Rodolfo Salinas, appeals from the judgment entered following a jury trial which resulted in his conviction of the unlawful possession of ammunition (Pen. Code, § 30305, subd. (a)(1)),[1] a felony, and his admission he previously had been convicted of the serious and violent felony of robbery (§ 211) within the meaning of the Three Strikes law (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)). The trial court sentenced Salinas to four years in state prison. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *Facts*.

    a. *The prosecution's case*.

On July 2, 2013, Detective Henry Saenz was assigned to the narcotics task force at the La Puente Sheriff's Station. Saenz, who usually worked out of the Industry Station, had been specially assigned to La Puente in order to assist in the execution of a search warrant for narcotics in Salinas's residence at 684 North Unruh in the City of La Puente. When he went to Salinas's home, Saenz realized he had seen Salinas on at least two prior occasions. Saenz had conducted field interviews with Salinas and had noted that in 2012, his address had been 694, not 684 North Unruh. When Saenz investigated the discrepancies in the addresses, they were confirmed by the Department of Motor Vehicles. Although Salinas apparently had access to the house at 684 North Unruh, he actually lived at 694 North Unruh. His girlfriend and their children lived at 684 North Unruh.

Saenz first went to the house at 684 North Unruh on July 2, 2013. He sat in an unmarked vehicle parked across the street and saw Salinas get out of a car in which he had been riding as a passenger and enter the residence. Salinas then came out the front door, walked around the house and into the back yard through a side gate. At that point, Saenz drove to a nearby location and "assembled [his] team," which consisted of his sergeant, three detectives, himself and several officers. The "team," who were all in a van, then went back to the residence to execute the warrant.

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

2

When they reached the house next door to Salinas's home, the team got out of the van and, as Saenz had heard a noise from behind the side gate, he opened it and saw Salinas. After Salinas had been placed in the back seat of a patrol car, the team searched the house at 684 North Unruh. As they did so, they used both audio and video tape to record their actions. They did this primarily so that the residents could not assert the officers had stolen or damaged anything during their search of the house.

When Saenz searched the garage, he found "a bag along the south wall . . . [which contained] numerous live .22 caliber rounds and one live 3006 round[]." After he had found the ammunition, Saenz "contacted" Salinas and told him what he had found. Later, as the officers were leaving the house, Saenz came into "contact[]" with "Salinas's girlfriend, and then another man." Saenz asked Salinas's girlfriend if she had known about the live ammunition in the garage and she told Saenz she had recently seen it there, had confronted Salinas about it and that he had told her he had intended to sell it.

During the search, nothing but the ammunition was found. Officers found no narcotics or other contraband.

After the search had been completed, Saenz advised Salinas of his rights pursuant to *Miranda*[2] and Salinas indicated he understood his rights and was willing to waive them. Saenz then told Salinas he had found "numerous live rounds of ammunition in the garage." When Saenz asked Salinas if the ammunition belonged to him, Salinas indicated "a neighbor . . . had moved from the neighborhood approximately three days [earlier and had given the ammunition] to [Salinas]." Salinas had planned to throw the ammunition away. Upon further inquiry by Saenz, Salinas admitted he was a convicted felon and knew it was illegal for him to possess the ammunition. Although it would have been possible, according to Saenz it was not his normal procedure to video or audio tape his conversations with suspects and he had not done so with regard to his interview with Salinas.

---

[2]      *Miranda v. Arizona* (1966) 384 U.S. 436.

Before leaving the house, Saenz placed Salinas under arrest. When Saenz next spoke with Salinas, he told Salinas that "if he was interested in providing any information on [the] other criminal elements in the neighborhood" and "[helping law enforcement] out with any cases . . . [Saenz would] release him." Saenz essentially offered Salinas the opportunity to be a "[d]efendant informant" because Salinas had "inner knowledge of criminal activity" with regard to such things as narcotics and gang activity which an ordinary citizen would not be able to provide. Saenz indicated he explained to Salinas that the "Sheriff's Department requires at least three cases . . . from [an] informant. And if the three cases result in arrests, . . . the informant's case [is] filed away." Salinas then apparently agreed to inform Saenz of criminal activity in the area and Saenz released him from custody. Saenz had not, however, had Salinas write down any form of a confession or their agreement and admitted he had made a mistake in failing to have done so. Saenz later wrote, from memory, a summary of what Salinas had told him. However, when, after two months Salinas had given Saenz no information, Saenz filed the case alleging Salinas had been in possession of ammunition with the district attorney's office.

b. *Defense evidence*.

Margaret Quevedo is Salinas's girlfriend. However, because the two "don't get along" and "fight a lot," she and Salinas's children live at 684 North Unruh Avenue in La Puente and Salinas lives at 694 North Unruh. Quevedo has a boarder, Paul Valdez, who has lived in her garage for approximately the last year.

Quevedo was aware of the fact Salinas had been arrested on July 2, 2013. Quevedo had also been taken into custody that day, although with regard to a different warrant pertaining to a different case. In addition, instead of being transported to the police station, she had been taken to a small building next to the police station. There, she was questioned "about the bullets" in the garage. Quevedo had told the police she had seen the bullets in the garage several days earlier and had asked Salinas if they belonged to him. Salinas had indicated they were his and he intended to sell them. Quevedo, who had never seen Salinas in physical possession of the bullets, nevertheless indicated she wanted them removed from her property because she was concerned about

4

the safety of her children.  Quevedo was not, however, aware of the fact Salinas was "prohibited from having [the] ammunition."

After questioning Quevedo, the police officer asked her if she, too, wished to be a "confidential informant."  Quevedo agreed to be an informant because she was told that if she cooperated, they would release her and Salinas.  In addition, an officer told her that, if she were to go to jail, it would be for a "long time" and they would take her children away from her.  Although Quevedo had agreed to provide the police with information, she never did so.

Salinas testified in his own defense.  After the search of the house at 684 North Unruh, officers asked Salinas if the ammunition belonged to him.  At first Salinas told the officers it did not.  However, one officer then told Salinas that "someone [was] going to jail for [those] bullets."  The officer continued, "Either gonna be you or your girlfriend." At that point, Salinas determined he had no choice.  He decided that, for the sake of his children, he had to state the bullets belonged to him.  He "just did what [he] thought [he] had to do to keep [his] family together."

Saenz transported Salinas to the police station and there asked him if he would "make a buy for [Saenz]."  Salinas indicated that, normally, he would have said he would not make the buy, however because the officer was "talking about taking [his] kids and taking [his] girl to jail, [he] told" Saenz he would do it on the condition Quevedo was not to know about it or to be involved in any way.  Saenz then released Salinas and, when he went home, the first thing Quevedo told him was that she had "to make a buy for this dude [and] that's why he let you out."  When Salinas then called Saenz to ask him why he had lied to him, Saenz told Salinas not to worry and to call Saenz back later.  When Salinas then called Saenz a couple of days later, Saenz refused to take his call.  Instead, Salinas received a letter indicating he had a court date.  The letter was, however, misleading as no court date had been set for Salinas's case.

Over defense counsel's objection, the prosecutor asked Salinas if he previously had suffered three convictions for robbery in violation of section 211 and that, in view of those convictions, he was "not to be in possession of any . . . ammunition."  Salinas

5

indicated the robberies had occurred 25 and 30 years ago and, although he knew he was not supposed to possess a firearm or ammunition, he was also no longer on parole. In response to the prosecutor's inquiry, Salinas then admitted he had told Saenz the ammunition belonged to him, but he had done so only because the officer had threatened to take his girlfriend and his children.

It was stipulated Salinas had previously been convicted of a number of felonies in case Nos. A537547 and KA009738.

2. *Procedural history*.

In an information filed November 12, 2013, it was alleged Salinas unlawfully owned, possessed or had under his control ammunition (§ 30305, subd. (a)(1)), a felony, after having been previously convicted of robbery (§ 211) in case No. KA009738 (count 1). It was further alleged that, prior to the commission of the offense alleged in count 1, Salinas had been convicted of three serious and or violent felonies (§§ 667, subd. (d), 1170.12, subd. (b)), all robberies in violation of section 211, and was thus subject to sentencing pursuant to the provisions of sections 667, subdivisions (b) to (i) and 1170.12, subdivisions (a) to (d), the Three Strikes law. Finally, it was alleged as to count 1 that, if convicted of the alleged offense, any time imposed would be served in state prison pursuant to section 1170, subdivision (h)(3) in that Salinas has suffered three prior convictions for robbery, each of which amounted to a serious or violent felony pursuant to section 667.5, subdivision (c) or 1192.7.

On the same day the information was filed, Salinas applied for and was granted in propria persona status. However, at proceedings held on November 26, 2013, Salinas indicated he no longer wished to proceed in propria persona and the trial court appointed the Alternate Public Defender's Office to represent him.

A jury trial in the matter began on February 25, 2014. Defense counsel's oral motion to continue the matter so that a *Pitchess*[3] motion might be heard was denied as the trial court found the motion to be untimely. In addition, the trial court and counsel

---

[3]     *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.

6

stipulated that Salinas's "prior conviction allegation [could be referred to] but no case information [was] to be given" and that "there [was] to be no reference by any witness that [Salinas was] in a criminal street gang."

During trial, evidence was presented that Detective Saenz asked Salinas if he wished to act as a defendant informant. In explaining to the jury what such an informant does, the detective stated: "Well, certain people have inner knowledge of criminal activity. . . . [L]aw enforcement can't function in a narcotics capacity or gang capacity . . . ." After Saenz had referred to "gang capacity," defense counsel objected and requested a sidebar. Counsel stated the detective had "clearly [been] told more than once not to present this as a case involving gangs. When he start[ed] to make the jury aware of why [he wished to use Salinas] as a confidential informant, . . . he talk[ed] about narcotics, which [was] fair game, but then he start[ed] to talk about gang activity . . . ." Defense counsel continued: "I think [he went] too far and taint[ed the jury's] opinion of who [Salinas] is and the reason why [they want to use] him. Basically what [he said was] . . . he's involved with gangs, drugs, and people who are not law abiding . . . ."

The prosecutor argued, although the detective had mentioned gangs, he had not "identif[ied] the defendant as a gang member or [indicated he had participated in] any gang activity." The prosecutor stated: "There's no narcotics in this case. And there's no gang allegation in this case. So if the court wants to later admonish the jury both regarding the narcotics and gangs . . . not being associated with this case, that's one thing, but there's been no direct or even indirect association with [Salinas] to being in a gang or a particular gang or conducting gang activity. And there's no connection to narcotics. Only that [law enforcement officers] were there to serve the search warrant for narcotics, which the defense opened the door to during [its] opening statement."

The trial court responded: "The question was, why do the police as a general proposition use informants?" The court continued, indicating "police officers utilize informants because the average person who is not . . . involved in criminal activity[, including that committed by gangs,] doesn't know about criminal activity. That doesn't mean that [Salinas] necessarily was [in a gang.] . . . I don't know if we're going to cause

7

more damage [by mentioning the issue]." The trial court indicated it might be best to simply instruct the detective, out of the presence of the jury, to not use the word " 'gang.' "

Defense counsel indicated she did not think they could simply "move on." She believed Salinas had been tainted and asked for a mistrial. The trial court denied the motion "[f]or the reasons stated." The trial court indicated that, as far as "the character of Mr. Salinas, we know that he's . . . a convicted felon. We don't know why and we aren't gonna find out why, and there was information . . . presented in the opening statement about the informant. . . . I suspect the defense is going to be he didn't cooperate with them . . . and now they're taking it out on him" and "that's a reasonable defense. So the issue of the informant had to be broached because if it wasn't broached by the prosecution, it would have been broached by the defense."

When the jurors returned to the courtroom, Salinas personally addressed them and stated: "They're not going to tell you guys this. And they're trying to give me the bullets that aren't mine." "I said 12 years for bullets that ain't mine." The trial court admonished Salinas, instructing him that he was not to speak anymore and instructed the jury to disregard any statements Salinas had made.

The prosecutor then informed the jury the parties had stipulated to the fact Salinas had previously been convicted of one felony in case No. A537547 and two felonies in case No. KA009738. The prosecutor stated: "The stipulation means that you must accept [these facts] as proved."

While the jurors were deliberating, the prosecutor indicated she was concerned about Salinas's comment "made directly to the jury while [the] court and counsel were at sidebar" that he faced 12 years in prison for "bullets that weren't his." The prosecutor indicated, although the trial court had admonished the jury, Salinas was "seeking to or appeared to the People to [be inviting] a mistrial." The trial court indicated it believed the jury would most likely disregard Salinas's "momentary outburst" and follow the court's instructions indicating it was "not to consider punishment for any purpose." This was particularly so since, in the meantime, the jury had sent to the court a note through

8

the bailiff requesting a readback of "Salinas'[s] testimony regarding his intention with the ammunition." The court stated it believed the jury's question went to "clarification as to what his intent was with the ammunition and that was part of the crux of the defense. The defense is saying that he only claimed ownership for the reasons so stated, and the prosecution is [indicating] that he possessed it [with] the intent to sell it." After the requested testimony was read to the jury, the jury returned to the jury room to continue deliberating.

At approximately 4:00 p.m. that same afternoon, the jury sent a second note to the trial court. This one read, "Not decided. 11 to 1[,] [o]ne is not going to change mind whatsoever[!] What happens when this happens?" The trial court indicated, since it was 4:10 in the afternoon, it intended to order the jurors to come back the following morning at 9:00. The trial court intended to let each juror "individually think about [his or her] position."

The following day, March 4, 2014, the jurors notified the bailiff they had reached a verdict. The jury had found Salinas "guilty of the crime of possession of ammunition in violation of . . . section 30305[, subdivision] (a)(1), a felony, as charged in count 1 of the information[.]"

The trial court sentenced Salinas on April 8, 2014. Initially, defense counsel moved to have Salinas's Three Strike priors stricken. One was from 1986 and two, which occurred in the same case, were from 1992. The trial court noted Salinas had, since the 1992 priors, remained free of arrests for crimes until 2001, when "he picked up a drug case." Based on the totality of the circumstances, the trial court denied Salinas's motion to strike all of the priors. It would strike only two.

After Salinas admitted having been convicted of the Three Strikes priors and the trial court heard argument by each of the parties, it sentenced Salinas to the mid-term of two years in prison, then doubled the term to four years pursuant to section 1170.12. The trial court then noted, pursuant to section 1170, subdivision (h)(3), the term was to be served in state prison.

9

The trial court awarded Salinas presentence custody credit for 193 days actually served and 192 days of good time/work time, for a total of 385 days. It then ordered Salinas to pay a $300 restitution fine (§ 1202.4, subd. (b)), a stayed $300 parole revocation restitution fine (§ 1202.45), a $40 court operations assessment (§ 1465.8, subd. (a)(1)) and a $30 criminal conviction assessment (Gov. Code, § 70373).

On April 10, 2014, Salinas filed a timely notice of appeal and request for appointment of counsel to represent him.

## CONTENTIONS

After examination of the record, appointed appellate counsel filed an opening brief which raised no issues and requested this court to conduct an independent review of the record. By notice filed August 28, 2014, the clerk of this court advised Salinas to submit within 30 days any contentions, grounds of appeal or arguments he wished this court to consider. No response has been received to date.

## REVIEW ON APPEAL

We have examined the entire record and are satisfied counsel has complied fully with counsel's responsibilities. (*Smith v. Robbins* (2000) 528 U.S. 259, 278-284; *People v. Wende* (1979) 25 Cal.3d 436, 443.)

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

                                        KLEIN, P. J.


We concur:


            KITCHING, J.            ALDRICH, J.

10